**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Terry Orsburn, | No. CV-17-00296-TUC-EJM |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Terry Orsburn ("Orsburn") brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Orsburn raises three issues on appeal: 1) the Administrative Law Judge ("ALJ") failed to weigh treating physician Dr. Foote's opinion; 2) the ALJ's residual functional capacity ("RFC") assessment is not supported by substantial evidence because the ALJ failed to follow the treating physician rule; and 3) the ALJ failed to provide clear and convincing reasons for discounting Orsburn's testimony regarding her functional limitations. (Doc. 13).

Before the Court are Orsburn's Opening Brief, Defendant's Response, and Orsburn's Reply. (Docs. 13, 14 & 15). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. For the reasons stated below, the Court finds that this matter should be reversed and remanded for further administrative

proceedings.

**I.    Procedural History**

Orsburn filed an application for Social Security Disability Insurance and Supplemental Security Income on June 24, 2013. (Administrative Record ("AR") 87). Orsburn alleged disability beginning on October 17, 2011 based on pain in her neck, back, shoulder, hip, and left leg, anxiety, asthma, and migraines. (AR 88). Orsburn's application was denied upon initial review (AR 98) and on reconsideration (AR 128). A hearing was held on January 5, 2016 (AR 59), after which ALJ MaryAnn Lunderman found, at Step Four, that Orsburn was not disabled because she could perform her past relevant work as a production coordinator as generally performed. (AR 30). The ALJ also made an alternative finding at Step Five that Orsburn could perform other work existing in the national economy. (AR 30–31). On April 27, 2017 the Appeals Council denied Orsburn's request to review the ALJ's decision. (AR 1).

Orsburn's date last insured ("DLI") for DIB purposes is March 30, 2017. (AR 87). Thus, in order to be eligible for benefits, Orsburn must prove that she was disabled during the time period of her alleged onset date ("AOD") of October 17, 2011 and her DLI of March 30, 2017.

**II.    Factual History**

Orsburn was born on June 21, 1959, making her 52 at the AOD of her disability. (AR 87). She has past relevant work as a stagehand, production coordinator, and production office manager. (AR 245).

A.    Treating Physicians[1]

On February 24, 2011 Orsburn saw Dr. Barron for right shoulder and neck pain after falling at work. (AR 331). On exam she had full ROM right shoulder, strength 5/5, neck tenderness but full ROM, and negative Neer and Hawkin's sign. (AR 332). Dr. Barron assessed sprain and strain of shoulder and upper arm, and recommended PT. (AR 332).

---

[1] While Orsburn's AOD is October 17, 2011, the Court has reviewed the entirety of the record in this matter, including the records preceding this date.

On April 7, 2011 Orsburn saw Dr. Barron for upper limb tingling, fatigue, and weakness. (AR 329). On exam she had full ROM right shoulder, strength 5/5, neck tenderness but full ROM, and diminished motion and diffuse tenderness of the cervical spine. Dr. Barron assessed sprain and strain of shoulder and upper arm, and neck sprain and strain. (AR 329).

An April 19, 2011 MRI of the cervical spine showed mid and lower cervical degenerative findings with mild canal stenosis and ventral cord flattening at C4/5 and C5/6. (AR 309). An MRI of the thoracic spine showed degenerative findings including right foraminal disc herniation at T2/3 and severe right foraminal narrowing at T3/4. (AR 311).

A June 6, 2011 letter from Dr. DiGiacinto notes that Orsburn fell at work and had severe pain in her shoulder and lower back, and that she continued to work. (AR 334). Her MRI showed chronic degenerative changes without acute disc herniation. On exam, she had excellent strength in upper and lower extremities and normal reflexes, positive SLR on the left, and minimal percussion tenderness in the intrascapular region.

A June 15, 2011 MRI of the lumbar spine showed multilevel disc degeneration and slight retrolisthesis, minimal annular bulge at T12-L1 and mild annular bulge at L1/L2. (AR 305).

On June 24, 2011 Orsburn saw Dr. Chapman for lower back, neck, and arm pain. (AR 323). She described her neck pain as dull, aching, throbbing, and sharp, 8/10 on average and 10/10 at worst. Her neck pain radiates into her shoulders and arms and causes numbness. She also has back pain, 9/10 on average, and associated with walking, sitting, and standing. Examination showed normal gait, cervical ROM 50 degrees flexion (normal 50), 40 degrees extension (normal 60), 50 degrees left rotation (80 normal), and 50 degrees right rotation (80 normal), bilateral upper extremity strength within normal limits, positive Spurling's test, and normal sensation and reflexes. Dr. Chapman's impression was cervical disc disorder without myelopathy and cervical radiculopathy, and Orsburn received a steroid injection. (AR 324, 341).

On August 2, 2011 Orsburn saw Dr. Chapman for a follow up. (AR 321). She reported the steroid injection helped 40% for 3 weeks and that currently her pain was 25% better. Orsburn rated her pain 7/10 and said the injection reduced the numbness. Dr. Chapman assessed cervical disc disorder without myelopathy and cervical radiculopathy and recommended she take pain medications as needed.

A September 8, 2011 letter from Dr. DiGiacinto states that Orsburn was continuing to work but had neck and lower back pain and paresthesias in the hands. (AR 333). He recommended chiropractic treatment and acupuncture, and noted she had some improvement from the epidural shot in her neck and recommended a second injection.

On September 16, 2011 Orsburn saw Dr. Chapman for a follow up and reported pain with variable intensity, currently 8/10. (AR 344). She described her pain as constant and improved with medications. Dr. Chapman noted she was "doing well for some time and recently had a return of pain." He administered another injection. (AR 345).

On September 27, 2011 Orsburn had an evaluation for acupuncture. (AR 347). She reported chronic neck pain radiating to the arms and hands, sometimes 9/10 and usually 4/10. Her back pain was 5/10 on average and 8/10 at worst. She also reported left shoulder pain and bilateral knee pain. She received treatments on October 6, October 20, and November 17, 2011, and January 12, 2012. (AR 307, 312, 359, 366).

An October 17, 2011 progress report from Dr. Barron opined that Orsburn had a 100% temporary impairment and could not return to work. (AR 301). Orsburn reported numbness in her left thigh and tingling in her left arm and hand. (AR 302). On exam she had full ROM in the right shoulder, strength 5/5, neck tenderness but full ROM, and diminished motion and diffuse tenderness in the cervical spine. (AR 302).

A November 17, 2011 progress report from Dr. Barron opined that Orsburn had a 100% temporary impairment and that she could not return to work because she had too many symptoms. (AR 297). Orsburn reported left neck, shoulder, and lower leg pain. (AR 298). On exam, she had diminished motion and diffuse tenderness in the cervical spine, positive Spurling's maneuver with radiating radicular pain, and weakness. (AR

298).

On December 15, 2011 Orsburn saw Dr. Chapman and reported pain 9/10 in her neck, back, and arms, and numbness in her left arm and leg. (AR 319). She stated acupuncture helped with the pain but not the numbness. On exam, the lumbar paraspinal muscle was tender to palpation, negative SLR bilaterally, LE strength 5/5, positive Spurling's test, and normal strength in upper extremities. Dr. Chapman assessed cervical disc disorder without myelopathy, cervical radiculopathy, lumbar disc disorder without myelopathy, and lumbar radiculopathy. (AR 320).

On January 12, 2012 Orsburn saw Dr. Chapman for a follow up and reported her pain had worsened. (AR 357). She reported numbness and a burning sensation on the left side of her body, a cringing feeling in her spine, and carrying heavy objects caused a buzzing and itching sensation in her arms, especially the left.

On January 31, 2012 Orsburn saw Dr. Chapman for a follow up and reported her pain was constant with the same intensity. (AR 361). Her neck pain was numbing and burning, 8/10, and radiating into the left side of her face and arms. Her back pain was sharp and aching, and aggravated by sitting, standing, and walking. Dr. Chapman noted she had a positive response to the last injection and administered another one. (AR 361–63).

On February 23, 2012 Orsburn saw Dr. Chapman and reported the injection helped 80% and currently her pain was 30% better and a 5/10. (AR 365).

A February 23, 2012 progress report from Dr. Barron states that Orsburn cannot return to work because she is still symptomatic. (AR 293). Orsburn reported tingling in the left side of her body and neck pain. (AR 294). On exam, she had full ROM in her right shoulder and neck, 5/5 strength, neck tenderness, and diminished motion and tenderness in the cervical spine. (AR 294).

On April 30, 2012 Orsburn saw Dr. Foote and reported numbness on the left side of her body, itching and burning sensations, twinges, and difficulty lifting her left arm. (AR 485). Findings on exam included: some decrease in neck rotation to the left but

otherwise normal ROM cervical spine; some give-way on muscle strength testing on the left but no true weakness; diminished but symmetrical tendon reflexes; normal sensory and coordination; normal flexion lumbar spine; and pain with passive ROM of left shoulder and left hip, but motion not limited. (AR 486). Dr. Foote's assessment was that her symptoms indicated neck and left arm pain, back and left hip pain, and headaches. (AR 487). He refilled her prescriptions and recommended PT and acupuncture.

On May 7, 2012 Orsburn had a physical therapy evaluation. (AR 284). She complained of thoracic region pain, 9/10, reported the left side of her body felt different and less sensitive, and that she could sit for one hour. The therapist noted that the evaluation findings were mixed because considerable energy was required to keep Orsburn focused. (AR 285). He stated that for the most part, neither cervical nor lumbar spine active ROM testing reproduced her complaints of pain, that results of strength testing on the left side were questionable, and that screening for light touch testing was unreliable because Orsburn flatly stated that her entire left side was different, even before beginning the test. (AR 285).

A May 8, 2012 workers' compensation form states that "Dr. Foote continues her off-work status, not taken off work by Dr. Foote." (AR 494). Another workers' compensation form completed by Dr. Foote on May 30, 2012 states that Orsburn has a 5% temporary impairment based on the nerve study showing mild carpal tunnel syndrome[2] and that she cannot return to work because of ongoing pain. (AR 500). The fax cover sheet states that "Dr. Foote supports the 60% disability already in place by Dr. Alton Barron in New York. The 5% is in addition." (AR 495).

On August 3, 2012 Orsburn saw Dr. Ibrahimi for left side numbness and weakness, headaches, and back pain. (AR 399). Findings on exam included neck supple with full ROM, strength 4/5 left arm and leg, left foot drop 4/5 with weakness with inversion and eversion, reduced sensation left shoulder and calf, reflexes bilaterally

---

[2] A May 29, 2012 needle exam showed mild carpal tunnel in the left upper extremity, and the left lower extremity was normal with the exception of absent tibial H-reflex. (AR 394).

symmetrical, and gait leaning to left side. (AR 400). Dr. Ibrahimi assessed displacement of cervical and lumbar and intervertebral disc without myelopathy, disturbance of skin sensation, and thoracic or lumbosacral neuritis or radiculitis. (AR 401).

An August 3, 2012 note from Dr. Moher states that Orsburn had been under his care and was 100% disabled for at least 12 months. (AR 336).

On August 14, 2012 Orsburn saw Dr. Berens for an initial consultation. (AR 380). She reported chronic pain for years, worse with exertion, and better in a supine position. (AR 381). Findings on exam included motor strength 5/5, abnormal ROM, facet loading positive, SLR negative, and abnormal gait. Orsburn reported that injections were effective at reducing her symptoms and Dr. Berens recommended she receive another one. (AR 382–83).

An August 21, 2012 PT progress report notes that Orsburn met her goals of being independent with her home exercise program and sleeping without discomfort, and that she substantially met her goals of standing and performing daily activities for 30–45 minutes and walking for 30–45 minutes, although her pain level varied from day to day. (AR 276). The therapist noted that her cervical and lumbar spine and left shoulder ROM varied widely from treatment to treatment. (AR 277).

On September 7, 2012 a PT discharge summary notes that Orsburn completed 24 sessions and partially met her goals to increase left shoulder elevation, demonstrate cervical spine active ROM within functional ranges, and demonstrate lumbar spine active ROM within functional ranges with a 0–3/10 complaint of pain. (AR 278–79). Orsburn did not meet her goal to tolerate daily activities with minimal complaints of pain and reported she could only tolerate a position or activity for a short duration before pain forced her to stop. (AR 279). The therapist noted that while she reported pain as high as 9.5/10 at her last session, she could tolerate her home exercise program better and a limited period of swimming. He also noted that her left ankle-foot orthosis "made a remarkable improvement in her gait sequence, eliminating her left foot-drop and notably decreasing her LBP and left LE pain." The therapist opined that PT had offered her the

most it could and recommended a team pain management approach.

A December 6, 2012 progress report from Dr. Barron opined that Orsburn had a 100% temporary impairment and that she could not return to work because she was still very symptomatic. (AR 289). Orsburn reported that her left side of her body still felt like she had a stroke and that PT only provided temporary relief. (AR 290). On exam, Orsburn had diminished and painful neck ROM, positive Spurling's maneuver and radiating radicular pain, and left shoulder weakness with internal and external rotation and mildly diminished motion due to pain. (AR 290).

On December 11, 2012 Orsburn saw Dr. Chapman for a follow up on neck pain and a cervical injection. (AR 316–17). She reported pain 10/10 and described it as stabbing, burning, sharp, aching, and dull, and said that any movement caused pain and that it improved with injections. (AR 316). On exam, Orsburn had a normal gait, strength 5/5, positive Spurling's test and facet loading maneuvers, and intact sensation and tendon reflexes. (AR 316). Cervical ROM flexion was 30 degrees (normal 50), extension 15 degrees (normal 60), left rotation 45 degrees (normal 80), and right rotation 30 degrees (normal 80). Orsburn received another injection. (AR 369).

On March 4, 2013 Orsburn saw Dr. Schroeder for a neurology consult. (AR 509). Findings on exam included normal strength, reflexes, and sensation. Dr. Schroeder assessed mild degenerative changes to the cervical spine, "certainly nothing here to be addressed from a surgical manner."

On March 25, 2013 Orsburn saw Dr. Ibrahimi for a follow up. (AR 403). Findings on exam included neck supple with full ROM, left arm and leg strength 4/5, left foot drop 4/5, reduced sensation left calf and shoulder, and gait leaning to left. (AR 404–05). Dr. Ibrahimi noted Orsburn had a good response to the injections but still had significant residual pain. (AR 405).

On March 28, 2013 Orsburn saw Dr. Berens for an injection. (AR 384–86). She reported partial benefit for a few months from her last injection. (AR 387). On exam, motor strength was 5/5, ROM abnormal, SLR negative, and gait normal. (AR 386).

A June 5, 2013 MRI of the left hip showed "tiny focus of intermediate signal within the superior labrum, coronal PD 11 of 21." (AR 398).

On June 27, 2013 Orsburn saw Dr. Berens for another injection. (AR 388–89). She reported excellent relief and 75–80% benefit for the past few months since her last injection.

A September 9, 2013 note from Dr. Moher states that Orsburn has been under his care for chronic pain syndrome and disc disease/arthritis; symptoms are chronic and expected to last more than one year. (AR 413). He opined that Orsburn could sit for one hour at a time, no more than four hours a day; stand for 15 minutes at a time, no more than four hours per day; walk for 15 minutes at a time, no more than 2 hours per day; lift and carry no more than 10 pounds; and may be limited in concentration/persistence secondary to pain/fatigue.

On July 23, 2014 Orsburn saw Dr. Berens for her neck pain. (AR 423). She had significant relief for about six months after her injection in June 2013, but moderately severe pain for the past few months. Dr. Berens administered another injection. (AR 424).

On November 11, 2014 Orsburn saw Dr. Ibrahimi for numbness in her arms. (AR 521). Findings on exam included neck supple with full ROM, left arm and leg strength 4/5, left foot drop 4/5, reduced sensation left calf and shoulder, reflexes symmetrical, and gait leaning to the left. (AR 522). Dr. Ibrahimi noted Orsburn had good response to injections but still had significant residual pain. (AR 523).

An August 14, 2015 letter from Dr. DiGiacinto notes that Orsburn reported restricted activity because of neck and back pain, restricted range of motion, and wore a foot brace but still had discomfort walking. (AR 555). On exam she had pain with neck rotation, back pain with left SLR, loss of sensation, and marked weakness in dorsiflexion in the left foot. He opined she had a permanent marked partial disability.

On September 23, 2015 Orsburn was seen by NP Young and reported joint pain, swelling, and stiffness, and left side nerve pain and paralysis. (AR 535). On exam she had

very limited ROM of the neck without pain, ataxic gait, and strength 3/5. (AR 536). NP Young assessed low back pain, chronic back pain, neck pain, and weakness.

An October 29, 2015 MRI of the c-spine showed multilevel spondylosis in the cervical spine with moderate canal stenosis at C4-5 and C5-6 and mild to moderate canal stenosis at C6-7, ventral cord contouring at C4-5, C5-6, and C6-7, and multilevel foraminal stenosis. (AR 545).

An October 30, 2015 workers' compensation form from Dr. DiGiacinto stated that Orsburn had not reached maximum medical improvement and still had neck and back pain. (AR 528). He opined that she could do less than sedentary work, and could never lift/carry, push/pull, climb, kneel, bend/stoop/squat, reach overhead or at/below shoulder level, or operate machinery, and could occasionally sit, stand, walk, or drive. (AR 529).

On November 11, 2015 Orsburn saw NP Young for a follow up. (AR 538). On exam upper and lower extremity strength were equal and gait steady. (AR 539).

On November 17, 2015 Orsburn saw Dr. Berens for an injection. (AR 546). He noted she had she had several months of relief after her last injection in December 2014.

On December 17, 2015 Orsburn saw NP Young to complete paperwork for her disability claim. (AR 540). On exam her gait was steady, left grip 2/5 and right grip 4/5. The assessment was cervicalgia, low back pain, and pain in left arm. (AR 540). NP Young assessed the following limitations: never lift with left hand and occasionally lift 0–5 pounds with right; stand for one hour; sit for 30 minutes; never climb, balance, stoop, or crouch; occasionally bend, kneel, and crawl; and occasionally reach, feel/handle, and push/pull only with her right hand. (AR 530–31).

B.    Agency Consulting Physicians

On October 28, 2013 Dr. Sanchez completed a consultative psychological exam and medical source statement. (AR 414–17). He opined that Orsburn's symptoms were mild and moderate and consistent with someone experiencing psycho-social stressors and difficulties related to medical problems and pain. (AR 417).

. . .

C.    State Agency Reviewing Physicians

On October 3, 2013 DDS physician Dr. Goodrich made an initial determination that Orsburn was not disabled. (AR 98). Dr. Goodrich completed a RFC assessment for light work with the following limitations: occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk for 6 hours, sit for 6 hours, unlimited pushing and pulling, occasionally climb ramps, ladders, and stairs, occasionally stoop, kneel, crouch, and crawl, frequently balance, limited overhead reaching, and avoid concentrated exposure to hazards. (AR 94–96).

On reconsideration, Orsburn was again found not disabled on March 11, 2014. (AR 128). DDS physician Dr. Woodard made substantially the same RFC assessment as Dr. Goodrich, except crouching was limited to frequently and Dr. Woodard found no environmental limitations. (AR 124–126).

D.    Workers' Compensation

In a decision by the State of New York Workers' Compensation Board, Judge Peel stated that she could not credit Dr. Moher's finding that Orsburn had a total disability because the clinical findings were limited to muscle spasm, left foot drop, and decreased left leg strength, and the clinical diagnostic testing from both before and after the workplace injuries indicated only degenerative findings. (AR 190). Judge Peel further stated that she could not credit Dr. Eskay-Auerbach's finding of no disability because she failed to consider Orsburn's subjective complaints of pain. *Id.* Judge Peel concluded that Orsburn had a mild degree of disability and awarded benefits. *Id.*

E.    Plaintiff's Testimony

On a Function Report dated September 24, 2013 Orsburn reported that she spends her days resting, watching tv, and going to doctor appointments. (AR 228). She cannot work or perform daily living functions without pain and discomfort. (AR 229). She is able to prepare her own meals and does housework with frequent breaks between chores. (AR 230). She cannot drive but can ride in a car and shop in stores. (AR 231). Her hobbies are reading and watching tv but she takes frequent breaks because she can't stay

in the same position for long. (AR 232). Her injuries affect her ability to lift, squat, bend, stand, reach, walk, sit, and kneel, and she can walk ½ a block before needing to rest for 1–2 minutes. (AR 233). She uses a brace daily that was not prescribed by a doctor. (AR 234).

At the hearing before the ALJ, Orsburn testified that she is able to drive "with difficulty sometimes." (AR 68). She uses her right hand because her left arms causes pain if she lifts it over a certain level, looking over her right shoulder is problematic, and sometimes her arms go dead and she has to pull off the road. She worked as a stagehand since she was 17 but had to stop working due to her injuries. (AR 69). She received workers' compensation for a period of time. (AR 70). She also worked as a production manager but would not be able to do a similar job at a law firm because she could not sit for that many hours at a computer. (AR 76–77).

Orsburn testified that she was unable to work because she had paralysis on the entire left side of her body, sitting and standing for any amount of time cause her pain, she can't lift anything, and if she lifts a grocery bag with too much weight she pays for it for days and spends many hours reclined on ice bags and taking pain killers. (AR 70). She can lift no more than five pounds but cannot lift anything with her left side because it makes her arms go dead. (AR 71–72). She can sit and stand for 15 minutes before it causes pain and problems. (AR 72). She can walk about the length of a football field, leans on a cart when grocery shopping, and takes lots of breaks on benches. Wearing tight high cowboy boots work as a brace for her, and in the summer she wears a leg brace for her left foot paralysis and left foot drop. (AR 72–73). She also wears a sacral belt and uses a back brace on bad days. (AR 73).

Orsburn spends her days managing her pain. The weight of her skull causes spine problems so she lays in a recliner on tops of ice packs, uses a TENS machine on her foot, and uses an inversion table. (AR 73). She used to train horses and took a dog training course, but she can't do those things now. (AR 74). She does volunteer as a docent at the zoo because it has a lot of benches where she can sit down and rest and if she's having a

bad day she doesn't have to go. (AR 74–75). She attempted to volunteer at the humane society but she is afraid if the dogs react she will end up crippled. (AR 75).

F. Vocational Testimony

At the hearing before the ALJ, Ruth Van Fleet testified as a vocational expert. She stated that Orsburn's past work as a stagehand was classified as heavy and skilled, and her work as a production coordinator and production office manager was light and skilled. (AR 79).

The ALJ asked Van Fleet to assume an individual with Orsburn's education and work experience with the following limitations: light exertional work, occasionally climbing ramps, stairs, ladders, ropes, and scaffolds, frequently balancing, occasionally stooping, kneeling, crouching, and crawling, overhead reaching bilaterally limited to frequently, and avoid hazards, machinery, and heights. (AR 79). Van Fleet testified that such a person could do Orsburn's past work as a production coordinator as customarily performed. (AR 79). She could also perform other work at the light level such as retail sales, hotel desk clerk, and general office clerk. (AR 81).

For the second hypothetical, the ALJ reduced the exertional level to sedentary. (AR 80). Van Fleet testified that Orsburn acquired transferrable skills that would enable her to work as a receptionist, order clerk, or telephone solicitor. (AR 80–81).

On questioning by Orsburn's attorney, Van Fleet testified that if a person had to switch from sitting to standing every 15 minutes, it would decrease their productivity. (AR 83). She further stated that if someone had to take two 15–20 minute breaks per day to lie down, in addition to the two customary 15 minute breaks and lunch break, it would eliminate competitive employment for that person. (AR 84–85).

G. ALJ's Findings

The ALJ found that Orsburn had the severe impairment of spine disorder. (AR 21). The ALJ found Orsburn's migraines were not severe because they were well controlled with medication. *Id.* The ALJ also found that Orsburn's affective disorder was not severe because it caused no more than minimal limitations on her ability to work.

(AR 22).[3]

The ALJ found that Orsburn's statements concerning the intensity, persistence, and limiting effects of her symptoms were partially credible because although the objective medical evidence "supports certain physical limitations that resulted from the established spinal issues, injections and other conservative measures reportedly have proven to provide up to 80 percent relief at times." (AR 24). The ALJ also noted multiple objective findings showing left arm and leg strength to be at 4/5 minimum, and full range of motion in the left upper extremity at times. *Id.*

The ALJ gave partial weight to treating physician Dr. Moher's opinion because his opinions were provided relatively early in the record and because his opinions were more restrictive than those supported by the totality of the medical evidence. (AR 27).

The ALJ gave great weight to consultative examiner Dr. Sanchez's opinion that Orsburn's adjustment disorder and depression was secondary to her medical conditions because the opinion was consistent with the record as a whole. (AR 28).

The ALJ gave little weight to Nurse Practitioner Young's opinions because she is not an acceptable medical source, she noted inconsistent findings, the opinions of the medical doctors were more persuasive, Young's opinions were inconsistent with the doctors' opinions, and Young's opinions were not fully supported by the record. (AR 28). The ALJ also noted that Young's opinions appeared to rely heavily on Orsburn's subjective complaints and not specific objective findings revealed on examination. (AR 29).

The ALJ also gave little weight to treating physician Dr. DiGiacinto's opinions because the opinions were conclusions that were inconsistent with the record as a whole, and because the opinions were conclusory in nature and made on a checkbox form. (AR

---

[3] The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00. To satisfy the paragraph B criteria, the mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id*. The ALJ found Orsburn had mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace, and no episodes of decompensation of extended duration. (AR 22).

- 14 -

29). The ALJ also gave little weight to the statements in Dr. DiGiacinto's narrative letter opinion because it was inconsistent with the medical record and the reports of Orsburn's improvement. *Id.*

The ALJ gave great weight to the opinions of state agency consultants Dr. Goodrich and Dr. Woodard because their opinions were consistent with the totality of the record. (AR 29). The ALJ also gave great weight to the opinions of state agency consultants Dr. Kerns and Dr. Garland because their opinions that Orsburn had only mild limitations resulting from her mental impairments were consistent with the record and with Dr. Sanchez's opinion. (AR 30).

The ALJ found that Orsburn had the RFC to perform light work with the following limitations: climbing of ramps, stairs, ladders, ropes, or scaffolds and stooping, kneeling, crouching, and crawling limited to occasionally; balancing and bilateral overhead reaching limited to frequently; and no exposure to hazards, machinery, or heights. (AR 23).

The ALJ found that Orsburn could perform her PRW as a production manager as generally performed. (AR 30). The ALJ also found that Orsburn could perform other jobs existing in the national economy. (AR 30–31). The ALJ therefore concluded Orsburn was not disabled. (AR 31).

### III. Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) the claimant's RFC precludes him from performing his past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the

Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

Here, Orsburn was denied at Step Four of the evaluation process. Step Four requires a determination of whether the claimant has sufficient RFC to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. A RFC finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms. Social Security Ruling (SSR) 96-8p. If the ALJ concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R. §§ 404.1520(f), 416.920(f).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational

interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (citing *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id*. (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV. Analysis

Orsburn argues that the ALJ failed to properly evaluate the opinions of Drs. Foote and DiGiacinto according to the treating physician rule and that the RFC assessment is therefore not supported by substantial evidence. (Doc. 13). Orsburn further argues that the ALJ failed to provide clear and convincing reasons for rejecting her subjective symptom testimony when negatively assessing her credibility. Orsburn requests that the Court remand this matter for an award of benefits or further administrative proceedings. (Doc. 13 at 25; Doc. 15 at 4).

The Commissioner argues that the Court should affirm the ALJ's decision because

the ALJ properly weighed the medical opinion evidence and the RFC is consistent with Dr. Foote's opinion. (Doc. 14). The Commissioner further states that if the ALJ did err in failing to consider Dr. Foote's opinion or Dr. DiGiacinto's opinion, the errors were harmless. Finally, the Commissioner argues that the ALJ reasonably weighed the credibility of Plaintiff's subjective complaints and provided valid reasons for negatively assessing Plaintiff's credibility.

The Court finds no error in the ALJ's assessment of Dr. Foote's treating physician opinion. However, the Court finds that the ALJ erred in failing to provide legally sufficient reasons for rejecting Dr. DiGiacinto's treating physician opinion and for negatively assessing Orsburn's credibility. These errors impacted the ALJ's RFC assessment and the hypotheticals posed to the VE. Consequently, these errors were not harmless because they ultimately impacted the ALJ's nondisability finding. Because factual issues remain regarding whether Orsburn is disabled under the regulations, the Court will remand this matter for further administrative proceedings.

A.    Treating Physician Opinions

Orsburn first argues that the ALJ erred by failing to properly evaluate the medical opinion of her treating physician, Dr. Foote. Similarly, in her second issue presented for review, Orsburn argues that the ALJ erred in assigning Dr. DiGiacinto's opinion little weight.

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 830). "Courts afford the medical opinions of treating physicians superior weight because these physicians are in a better position to know plaintiffs as individuals, and

because the continuity of their treatment improves their ability to understand and assess an individual's medical concerns." *Potter v. Colvin*, 2015 WL 1966715, at *13 (N.D. Cal. Apr. 29, 2015). "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Garrison*, 759 F.3d at 1012 (internal quotations and citations omitted). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's ADL. *Tommassetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). "An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* However, "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Finally, if the ALJ determines that the plaintiff's subjective complaints are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those subjective complaints. *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

1   1.  Dr. Foote

2       Orsburn argues that the ALJ failed to evaluate, weigh, or discuss Dr. Foote's May

3   20, 2012[4] opinion that Orsburn could not return to work due to ongoing pain with

4   activity, and that based on her mild carpal tunnel syndrome, she had a 5% temporary

5   impairment in addition the 60% impairment assessed by Dr. Barron. (Doc. 13 at 13)

6   (citing AR 495, 500). Orsburn alleges that the ALJ committed reversible error by failing

7   to even mention this opinion, and argues that the opinion is supported by Dr. Foote's own

8   treatment notes. *Id.* (citing AR 485–86, 526).

9       Orsburn saw Dr. Foote early in the treatment record—she attended one

10  appointment with him on April 30, 2012 (AR 485). On May 8, 2012 he completed a form

11  for her workers' compensation case that stated "Dr. Foote continues her off-work status,

12  not taken off work by Dr. Foote." (AR 494). A second workers' compensation form

13  completed by Dr. Foote on May 30, 2012 states that Orsburn has a 5% temporary

14  impairment based on the nerve study showing mild carpal tunnel in her left arm, and that

15  she cannot return to work because of ongoing pain. (AR 500). The fax cover sheet states

16  that "Dr. Foote supports the 60% disability already in place by Dr. Alton Barron in New

17  York. The 5% is in addition." (AR 495).

18      While the ALJ reviewed Dr. Foote's findings in her written decision (AR 25–26),

19  she did not specifically reference his opinion that Orsburn had a 5% temporary

20  impairment. She did, however, note that Dr. Foote reviewed Orsburn's EMG study and

21  "concluded the studies showed mild carpal tunnel syndrome of the left upper extremity,

22  and the study of the left lower extremity was within normal limits with the exception of

23  the noted absent tibial H-reflex." (AR 26). These are the same findings Dr. Foote noted

24  on the May 30, 2012 form. (AR 500). Thus, it is clear that the ALJ reviewed all of the

25  record evidence from Dr. Foote, including the May 2012 opinion, even if she did not

26  specifically mention the 5% temporary impairment rating. *Compare Marsh v. Colvin*, 792

27  F.3d 1170 (9th Cir. 2015) (finding harmful error where ALJ's decision failed to even

28  _____

[4] While Orsburn states the opinion is from May 20, 2012, the form indicates that Dr. Foote signed it on May 30, 2012. (AR 500).

mention treating doctor's opinion or notes). Further, while the Commissioner is required to "make fairly detailed findings in support of administrative decisions to permit courts to review those decisions intelligently," the Commissioner is not required to "discuss *all* evidence." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. 1984) (emphasis in original). "Rather, she must explain why 'significant probative evidence has been rejected.'" *Id.* (citation omitted); *see also* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion.").

In addition, it is unclear who wrote the note on the fax cover sheet, and there is nothing in Dr. Foote's notes from Orsburn's April 30, 2012 appointment indicating that he believed she was 65% disabled.[5] The May 30, 2012 form opines that Orsburn cannot return to her job as a stagehand because of ongoing pain, that it was unknown how long this restriction would last, and that she had a 5% temporary impairment. (AR 500). The form does not opine that Orsburn is permanently disabled and cannot work at all, nor does it recommend any specific work limitations; thus, Dr. Foote's opinion is not inconsistent with the ALJ's RFC for light work[6] with frequent overhead reaching.

Finally, the undersigned notes that Orsburn's argument on this point is focused on a form that Dr. Foote completed for her workers' compensation claim. However, workers' compensation decisions are not binding on the Commissioner; nor are physician's statements of disability. *See* SSR 06-03p at *6 (While the Commissioner is "required to evaluate all the evidence in the case record that may have a bearing on [the]

---

[5] The Court further notes that while on several occasions Dr. Barron opined that Orsburn had a 100% temporary impairment, there does not appear to be any opinion in the record that Orsburn had a 60% impairment, temporary or permanent.

[6] *See* 20 C.F.R. 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

determination or decision of disability, including decisions by other governmental and nongovernmental agencies, . . . a determination made by another agency . . . is not binding on [the Social Security Administration].").[7]

Based on the foregoing, the Court finds no harmful error in the ALJ's assessment of Dr. Foote's opinion. *See Marsh*, 792 F.3d at 1172 (holding that harmless error applies in cases where ALJ fails to mention medical opinion).

### 2. Dr. DiGiacinto

Orsburn argues that the ALJ failed to properly weigh Dr. DiGiacinto's opinion that she was limited to less than sedentary work. (Doc. 13 at 15) (citing AR 527–29, 555).

Dr. DiGiacinto completed a form for Orsburn's workers' compensation claim on October 30, 2015. (AR 527–29). He stated that she had not reached maximum medical improvement and continued to have neck and lower back pain, and that she was limited to less than sedentary work due to her exertional limitations: never lift/carry, push/pull, climb, kneel, bend/stoop/squat, reach overhead or at/below shoulder level, or operate machinery; and occasionally sit, stand, walk, drive, and do simple grasping and fine manipulation.

Dr. DiGiacinto's opinion was contradicted by the opinions of state agency physicians Drs. Goodrich and Woodard. Accordingly, the ALJ was required to provide specific and legitimate reasons to discount Dr. DiGiacinto's opinion. The Court finds that the ALJ failed to meet that standard here.

The ALJ assigned little weight to DiGiacinto's opinion for two reasons. First, the ALJ noted that the opinion was conclusory in nature because it was on a check box form. "The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). In addition, "[t]he better an explanation a source provides for a medical opinion, the more weight [the Commissioner] will give that medical opinion." *Id.* Based on the record before the Court, it appears that

---

[7] SSR 06-03p has been rescinded effective March 27, 2017 (after the ALJ's decision in this matter).

Orsburn saw Dr. DiGiacinto three times before he made his October 2015 opinion. *See* AR 334 (June 6, 2011 appointment), AR 333 (September 8, 2011 appointment), and AR 555 (August 14, 2015 appointment). While there is limited information on the check box form to support Dr. DiGiacinto's opinion, he also wrote a letter opinion documenting the results of his August 14, 2015 examination of Orsburn. (AR 555). Defendant argues that the letter was actually written two months before Dr. DiGiacinto completed the form and thus could not have commented directly on the form; however, the opinions on the form are also based on the August 14, 2015 examination, and when read together, the letter opinion lends support to the opinions on the check box form. Thus, while the form by itself is conclusory in nature, when taken together with the letter opinion, the check box form is "entitled to weight that an otherwise unsupported and unexplained check-box form would not merit." *Garrison*, 759 F.3d at 1013, n.17 (check-box forms "were entirely consistent with the hundreds of pages of treatment notes").

Second, the ALJ found that the opinion was inconsistent with the entirety of the record, including the records noting improvement from conservative treatment methods like medication, injections, and PT. Orsburn contends that the record actually shows the opposite—for example, she completed PT but was still extremely limited (AR 279), and she had 80% improvement from an injection but it only lasted for a few weeks (AR 365, 486). The ALJ may not manufacture a conflict with respect to the outcome of treatment by asserting that Orsburn's records show improvement, when in fact the records show that she consistently reported neck, shoulder, arm, leg, and back pain that responded only briefly and partially to treatment. *See Garrison*, 759 F.3d at 1013. While at times Orsburn did report improvement in her symptoms, she did not experience complete relief, and no doctor opined that she experienced relief sufficient that she would be able to return to work.[8]

The ALJ rejected DiGiacinto's letter opinion for the same reasons, and also noted that his conclusions were "inconsistent with previous medical records, including those

[8] *See* Section C below for further discussion of Orsburn's response to treatment.

records which reflect little to no limitations in cervical range of motion and the up to eighty percent (80%) pain relief reported at various times . . . The opinion is also inconsistent with the report of remarkable improvement in gait sequence, the elimination of the left foot drop and notable decrease in lower back and left lower extremity pain . . . ." (AR 29) (citing exhibit 1F). While "[a] conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider," *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014), the ALJ may not manufacture a conflict by cherry-picking the evidence to support a finding of non-disability. The ALJ's finding that Dr. DiGiacinto's opinion was inconsistent with the record "is belied by the evidence and must be rejected." *Garrison*, 759 F.3d at 1015. First, there are numerous instances in the record where Orsburn's treating providers observed that she had diminished or abnormal motion of the cervical spine (AR 294, 298, 316, 323, 329, 381, 386) and pain with neck rotation (AR 290, 536). Second, as in *Garrison*, the "records make clear that epidural shots . . . relieved [Orsburn's] back pain for only variable, brief periods of time . . ." 759 F.3d at 1015. Finally, while the PT noted that Orsburn's left ankle foot orthosis made a remarkable improvement in her gait, eliminating her left foot drop and notably decreasing her LBP and left LE pain (AR 279), at subsequent medical appointments Orsburn was noted to have an ataxic gait (AR 536) and gait leaning to the left (AR 404, 522), foot drop 4/5 (AR 404, 522), and increased back pain (AR 536, 555).

While none of the other treating or state agency physicians opined that Orsburn was limited to less than sedentary work,[9] treating physician Dr. Moher assessed limitations consistent with a sedentary RFC (AR 413) and Dr. DiGiacinto's opinion is only slightly more restrictive. For example, DiGiacinto opined that Orsburn could occasionally sit, stand, and walk (defined as up to 1/3 of the time). Moher opined that she

---

[9] For example, as discussed above, Dr. Foote opined that Orsburn had a 5% temporary impairment and could not return to work as a stagehand, but he did not opine that she could never work at all, nor did he assess any limitations. (AR 500). State agency physicians Drs. Goodrich and Woodard opined that Orsburn could perform light work (AR 98, 124–26).

could sit for no more than 1 hour at a time and no more than 4 hours per day, stand for no more than 15 minutes at a time and no more than 4 hours per day, and walk for no more than 15 minutes at a time and no more than 2 hours per day. The two opinions do not conflict in this regard. While DiGiacinto opined that Orsburn could never lift or carry, Moher opined that she could lift and carry no more than 10 pounds. Thus, while Dr. DiGiacinto assessed slightly more restrictive lifting limitations, Dr. Moher's opinion was also rendered much earlier in the treatment record and it is reasonable that Orsburn's ability to lift and carry may have decreased over time.

Further, similar to Dr. DiGiacinto's opinion, the restrictions NP Young assessed also support a less than sedentary RFC. (AR 530–31). While Defendant argues that nurse practitioners are not acceptable medical sources under the regulations and thus her opinion is entitled to less weight, opinions from other sources must still be evaluated and the ALJ may discount their testimony only by giving reasons germane to each witness. *See Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014). Pursuant to SSR 06-03p, "[i]nformation from these 'other sources' cannot establish the existence of a medically determinable impairment. . . . However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Thus, as one of Orsburn's treating providers, NP Young qualified as an "other source" that can provide evidence about the severity of Orsburn's impairments and how they affect her ability to work. 20 C.F.R. § 404.1513(d). Young's opinion that Orsburn could never lift with her left hand and occasionally lift 0–5 pounds with her right hand is similar to Dr. DiGiacinto's opinion that Orsburn could never lift or carry and lends support to the opinion.[10]

However, the Court does note that, like Dr. Foote, Dr. DiGiacinto's opinion was made on a check box form for Orsburn's workers' compensation claim. While the ALJ may not ignore a "medical opinion merely because it was issued in a workers'

---

[10] However, the Court also notes that the ALJ assigned little weight to NP Young's opinion, a finding that Orsburn does not challenge.

compensation context[,]" the "terms employed in workers' compensation disability rating are not equivalent to Social Security disability terminology." *Bowser v. Comm'r of Soc. Sec.*, 121 F. App'x 231, 242 (9th Cir. 2005). "The workers' compensation and Social Security standards operate as different paradigms. [Workers' compensation] activity modifications are framed as what [a] Claimant should not do, as opposed to the Commissioner's concern of what her 'capacity' is." *Id.* at 243. Thus, Dr. DiGiacinto's opinion on the workers' compensation form that Orsburn could perform less than sedentary work is not necessarily equivalent to a finding of disability under the Social Security regulations.

Finally, Orsburn argues that the ALJ erred by failing to consider that Dr. DiGiacinto is a specialist in neurosurgery. (Doc. 13 at 21) (citing AR 555). Because the ALJ did not assign Dr. DiGiacinto's opinion controlling weight, she was required to evaluate his opinion according to the requirements set out in 20 C.F.R. § 404.1527(c), including whether Dr. DiGiacinto was a specialist. In light of the ALJ's conclusion that Dr. DiGiacinto's opinion was entitled to little weight, the Court cannot find that this error was harmless. Because the ALJ did not specifically mention Dr. DiGiacinto's specialty in her decision, it is unclear whether she properly considered it, and, if she had, she may have assessed his opinion differently.

In sum, the Court finds that the ALJ failed to provide specific and legitimate reasons for discounting Dr. DiGiacinto's opinion. This error is not harmless because it affected the ALJ's RFC assessment and the ultimate nondisability finding.

B.    RFC Assessment

Orsburn next argues that the RFC is not supported by substantial evidence because the ALJ failed to follow the treating physician rule in evaluating Dr. Foote's and Dr. DiGiacinto's opinions. Orsburn does not specifically argue which portion(s) of the RFC are allegedly faulty but instead focuses her argument on the ALJ's discounting of Dr. DiGiacinto's opinion, as already discussed above.

RFC is "the most [a claimant] can still do despite her limitations," and includes

assessment of the claimant's "impairment(s), and any related symptoms, such as pain, [which] may cause physical and mental limitations that affect what she can do in a work setting." 20 C.F.R. § 404.1545(a)(1). The Commissioner retains the ultimate responsibility for assessing a claimant's RFC. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). The ALJ was required to assess Orsburn's RFC based on all the record evidence, including medical sources, examinations, and information provided by Orsburn. 20 C.F.R. §§ 404.1545(a)(1)-(3), 416.945(a)(1)-(3). However, the ALJ need not include all possible limitations in her assessment of what a claimant can do, but rather is only required to ensure that the RFC "contain[s] all the limitations that the ALJ found credible and supported by the substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006).

As discussed above, the Court finds no error in the ALJ's assessment of Dr. Foote's opinion, and the ALJ's RFC assessment is not inconsistent with Dr. Foote's opinion. Dr. Foote found that Orsburn had a 5% temporary impairment based on her mild carpal tunnel and that she could not return to her job as a stagehand, but he did not assess any specific limitations, nor did he opine that she could not return to work at all. The ALJ also found that Orsburn could not return to her work as a stagehand, but that she could perform a reduced range of light work.

However, the Court does find that the ALJ erred in assigning little weight to Dr. DiGiacinto's opinion, and the ALJ's RFC assessment fails to incorporate any of Dr. DiGiacinto's recommended limitations. For example, Dr. DiGiacinto opined that Orsburn could never lift or carry, but the ALJ found that Orsburn was able to perform light work, which by definition involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. 404.1567(b). While the Court does not offer an opinion as to whether DiGiacinto's opinion should have been given controlling weight, had the ALJ assigned greater weight to Dr. DiGiacinto's opinion and incorporated additional limitations in the hypothetical to the VE, the

outcome of the proceedings would have been different. Accordingly, this error was not harmless because it affected the ultimate non-disability determination.

## C. Credibility

Lastly, Orsburn argues that the ALJ erred in failing to provide clear and convincing reasons for discounting her testimony regarding the functional limitations stemming from her impairments. Specifically, Orsburn alleges that the ALJ erred by discounting her testimony solely because it was not supported by the objective medical evidence (citing SSR 96-7p), because the ALJ relied on Orsburn's 80% improvement while failing to mention that the relief was only temporary (citing AR 365), and because the ALJ did not consider the positive impact of her admirable work history (citing AR 203). (Doc. 13 at 24).

"An ALJ's assessment of symptom severity and claimant credibility is entitled to great weight." *Honaker v. Colvin*, 2015 WL 262972, *3 (C.D. Cal. Jan. 21, 2015) (internal quotations and citations omitted). This is because "an ALJ cannot be required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Treicherler v. Comm'r. Soc. Sec. Admin*., 775 F.3d 1090, 1106 (9th Cir. 2014) (citation omitted). "If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court may not engage in second-guessing." *Honaker*, 2015 WL 262972 at * 3 (internal quotations and citation omitted).

While questions of credibility are functions solely for the ALJ, this Court "cannot affirm such a determination unless it is supported by specific findings and reasoning." *Robbins v. Comm'r Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006). "It is well settled that an ALJ may discount a claimant's testimony on the grounds that (1) it is inconsistent with objective medical evidence, (2) there is a lack of corroborating medical evidence, or (3) there is insufficient medical evidence to establish disability during the insured period." *Rossiter v. Berryhill*, 2018 WL 1041172, *7 (D. Oregon Feb. 2, 2018). However, "lack of medical evidence cannot form the sole basis for discounting pain

testimony." *Burch*, 400 F.3d at 681.

Here, the ALJ concluded that although the objective medical evidence supported certain physical limitations from Orsburn's spinal issues, Orsburn's testimony was only partially credible because she had up to 80% relief at times, multiple objective findings showed left arm and leg strength to be 4/5 minimum, and she had full ROM in the left shoulder/upper extremity at times. (AR 24). While Defendant concedes that the ALJ would have committed error if she only discounted Orsburn's credibility because her complaints were not supported by the objective medical evidence, Defendant contends that the ALJ also provided a second, legally sufficient reason—Orsburn's positive response to treatment. However, this "reason[] is belied by the evidence and must be rejected." *Garrison*, 759 F.3d at 1015.

The Court notes the following from the record: Orsburn reported her first injection provided 40% relief for three weeks, and her pain was 25% better at a follow up (AR 324); pain improved with medication (AR 344); acupuncture helped (AR 319); pain worse (AR 357); injection helped 80% and pain was 30% better (AR 365); injections effective at reducing symptoms (AR 382); PT goals partially met but did not meet goal to tolerate daily activities without complaints of pain (AR 278–79); PT provided only temporary relief (AR 290); pain improved with injections (AR 316, 405); partial benefit for a few months after last injection (AR 387); excellent relief and 75-80% benefit since last injection (AR 388–89); significant relief for six months after last injection (AR 423); good response to injections but significant residual pain (AR 523); and several months relief after last injection (AR 546). Thus, while Orsburn has reported up to 80% relief at times, she also continued to experience "significant residual pain" and has never reported complete or permanent relief. "At most, this evidence demonstrates that, for a brief period of time, [Orsburn] experienced some relief from [her] pain." *Lester*, 81 F.3d at 833; *see also Garrison*, 759 F.3d at 1015 n.20 ("In any event, we doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment."). "In sum, there is no support in the record for the ALJ's belief that physical therapy and

epidural shots alleviated [Orsburn's] pain enough that her testimony regarding pain was incredible." *Garrison*, 759 F.3d at 1015. To the contrary, the record shows that despite pursing PT, acupuncture, injections, and medication, Orsburn's pain persisted throughout the treatment period, and her subjective symptom testimony is consistent with this evidence.

Finally, the undersigned finds that the ALJ erred by failing to note Orsburn's positive work history. Orsburn testified that she worked as a stagehand since she was 17, and her work history reports document that she has worked as a stagehand, production coordinator, and production office manager from 1976–2011. (AR 236, 245). Given the ALJ's negative credibility assessment, the undersigned cannot say that this error was harmless because had the ALJ considered Orsburn's work history, she may have assessed Orsburn's credibility more positively. *See Poe v. Astrue*, 2009 WL 2485994, *14 (D. Ariz. Aug. 12, 2009) ("Plaintiff has a solid forty-five-year work record, which bolsters his credibility regarding his inability to work.").

In sum, the Court finds that the ALJ erred in discrediting Orsburn's subjective symptom testimony based on her positive response to treatment. The undersigned further finds that this error was harmful and negates the validity of the ALJ's ultimate nondisability determination because the ALJ's adverse credibility finding affected the limitations that the ALJ assessed in the RFC finding and the corresponding hypothetical presented to the VE, which in turn could alter the outcome of the case. *See Batson*, 359 F.3d at 1197. Accordingly, the Court finds that remand is appropriate.

### V. Remedy

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690.

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir.1989) (*quoting Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir.1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke*, 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings.... Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1995).

"[T]he required analysis centers on what the record evidence shows about the existence or non-existence of a disability." *Strauss v. Comm. Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011). "Administrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence may well prove enlightening in light of the passage of time." *Treichler v. Comm. Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014) (internal quotations and citations omitted). "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate." *Id.* "In evaluating [whether further administrative proceedings would be useful, the Court considers] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." *Id.* at 1103–04.

Here, the Court finds that "[r]emand for further administrative proceedings is appropriate [because] enhancement of the record would be useful." *Benecke*, 379 F.3d at

593. The ALJ erred by failing to provide legally sufficient reasons for negatively assessing Orsburn's credibility and assigning little weight to Dr. DiGiacinto's opinion. Because of these errors, issues remain regarding Orsburn's RFC and her ability to perform work existing in significant numbers in the national economy. Further, the undersigned notes that the most recent medical record in the administrative record is from December 2015. Because Orsburn's DLI is March 30, 2017, it may be useful to supplement the record on remand, if warranted, if there is new evidence that is material to the disability determination, both to document the current state of Orsburn's conditions as well as to augment the medical records previously submitted in this case. *See Treichler*, 775 F.3d at 1101 (9th Cir. 2014) ("presentation of further evidence may well prove enlightening in light of the passage of time.").

This Court offers no opinion as to whether Orsburn is disabled within the meaning of the Act. However, the ALJ is required to consider all of Orsburn's alleged impairments, whether severe or not, in her assessment on remand, and "[t]he RFC assessment must be based on *all* the relevant evidence in the case record." SSR 96–8p, 1996 WL 374184, at *5 (emphasis in original) ("The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone."); C.F.R. § 416.920(e) (ALJ must consider claimant's subjective experiences of pain).

## VI. Conclusion

In light of the foregoing, the Court **REVERSES** the ALJ's decision and the case is **REMANDED** for further proceedings consistent with this decision, including additional hearing testimony, if necessary.

Accordingly, **IT IS HEREBY ORDERED** that the Commissioner's decision is remanded back to an ALJ with instructions to issue a new decision regarding Orsburn's

eligibility for disability insurance benefits. The ALJ will: (1) reassess Orsburn's credibility; (2) reassess Dr. DiGiacinto's opinion and give further consideration to all of the previously submitted medical records; (3) further develop the record, as needed, to fully and fairly assess Orsburn's conditions and limitations, (4) further consider Orsburn's residual functional capacity, citing specific evidence in support of the assessed limitations, and (5) continue the sequential evaluation process to assess whether in fact Orsburn is disabled within the meaning of the SSA and whether she is able to perform any work existing in the national economy.

**IT IS FURTHER ORDERED** the Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 24th day of August, 2018.

Eric J. Markovich
United States Magistrate Judge